Shinn v. Shinn.

---

## MARY B. SHINN

*v.*

## HOWARD SHINN.

1. Every wife is entitled to a home corresponding with the circumstances and condition of her husband, over which she shall be permitted to preside as such wife, and it is the duty of the husband to furnish such home.

2. A house over which others have entire control and in which the husband and wife reside as boarders simply, is not such home.

On bill &c. for alimony.

*Messrs. Scovel & Harris,* for the complainant.

*Messrs. Gilbert & Atkinson,* for the defendant.

BIRD, V. C.

The bill is filed by Mrs. Shinn against her husband for an order directing him to provide for her suitable support and maintenance, upon the ground of his desertion of her. The proper determination of this question is not free from difficulty. Upon the surface, the husband appears to have been willing not only to provide for the support of his wife and child, but to live

with her as her husband; and while this is so, the proof makes it quite clear that if he had any affection for her or for his child it was very feeble indeed. There are many circumstances in the case that impress the mind with the belief that while he was looking in one direction, he was moving energetically in another. And yet it is true, to some extent at least, that this observation may be made as to the conduct of Mrs. Shinn.

However, I think the fair or just conclusion, under all the facts of the case, is that while Mr. Shinn did not want to put himself within the reach of the law, yet it was his determination to bring about a separation between himself and his wife, and was glad when such an event happened. I will briefly refer to the facts which are the basis of my conclusion. The parties were married in May, 1890. In about two weeks after their marriage, Mr. Shinn took his wife to the home of his parents in Bordentown. He was the owner of the house in which they lived. The family consisted of his father and mother, brother and sister and nephew and niece. There he had one bed-room, which he furnished with furniture, as far as appears, in every way suitable to their station. Mrs. Shinn had a piano, which was placed in the parlor. They took their meals at the table with the rest of his father's family above named. They remained there until about the 1st of May, 1891, when Mrs. Shinn, with her baby, went to her grandfather's at Burlington. She says she left because of ill-treatment by her husband and the other members of his family. Her husband and the other members of the family to whom she alludes emphatically deny her statements.. If the testimony in this respect stood alone the bill would be dismissed. There is other testimony in the case which tends strongly to corroborate the wife as to the temper or disposition of the husband towards her. While it does not directly contradict the other witnesses or sustain the wife as to her treatment by her husband or the members of his family above referred to, yet it very strongly supports the conclusion that he was living with her there in a very cold and formal manner, and that he must have allowed every sentiment of true regard to have been dispelled; for, within a day or two after she left, Mr.

Shinn v. Shinn.

Shinn met the grandfather of his wife upon the train, when he expressed an entire willingness that she should have her things and her piano, and that the grandfather might come and take them away. But when the grandfather asked for the baby carriage this was, in effect, refused him, for Mr. Shinn said that he intended to give that to his sister. At the same time he emphatically declared that he never would live with her again. This declaration to this old man who was so much interested in the welfare of his granddaughter as to take her to his home and to make these inquiries respecting her welfare, shows that Mr. Shinn was very deeply embittered in his mind against his wife and child. This interview took place upon the 9th of May.

Notwithstanding this evident condition of his mind, on the 11th of May he wrote her the following note:

"BORDENTOWN, May 11th, 1891.
"To My Wife:—
"You have left my house and the house I have provided for you and I want to say that I have this home still open to you, and am willing to support you there. I cannot pay board away and board myself too, and get along. As your lawful husband I want to notify you to come here now and live and I will support you and do my part and get along right. Please let me know what you intend to do. You left of your own accord and must come back.
"HOWARD SHINN."

To this she replied the following day in these words:

"BURLINGTON, N. J. May 12, 1891.
"My Dear Husband,—
"In answer to your note, the house you provided for me you have never given me possession of any part of it. Now if you set a room apart to put our things in I am willing to go back and bury all the past and live for the future, and your home shall be my home, where you stay I will stay. Answer soon.
"MAMIE B. SHINN."

To this note he replied the same day in these words:

"BORDENTOWN, May 12th, 1891.
"To My Wife:—
"Yours of the 12th, inst. received, in reply would say the same home we lived in is still ready for you and you must come back to it or forfeit all claims

Shinn *v.* Shinn.

on me for support. You wilfully deserted me and must redeem yourself. I have nothing more to say: Will you come back?

"H. SHINN."

This was followed on the next day by a note from her, which I quote:

"BURLINGTON, N. J. May 13, 1891.

"TO MY HUSBAND,—

"Yours of the 12th, received. Howard as I said before I am willing to go with you if only in two rooms where I can be mistress. Do you intend to throw me and your baby on my poor old grand-pa for support. Do you remember the promise you made nearly one year ago to protect and take care of me? If you have forgotten I have not. Do you intend to blight my young life? Howard you know I cannot endure living the way I have, it will surely kill me.

"Your wife.

"MAMIE B. SHINN."

When I read this correspondence, with the aid of the other testimony in the cause, the conviction that Mr. Shinn knew that his wife had been made so unhappy, living as she had been living, for nearly one year, as a boarder in the home of his father, that she was, because of such unhappiness, compelled to leave, and that, because of that fact, she would not return to him at that place, and that, for the same reason, he could safely send her the cold, formal invitation to return, which he did without the least probability of her doing so, is greatly strengthened. Two days before this correspondence began, he said to her grandfather that he intended to give the baby carriage to his sister, and that he never would live with her again, and some time afterwards he said to his wife, in the presence of her sister, that he never would live with her again. It is apparent that his mind was unchanged, and that his object, in his correspondence, was more to avoid any legal liability than in an honest and faithful manner to perform the obligations of a husband and a father. His subsequent conduct, I think, is a verification of what I have said.

After the complainant had rested her case, Mr. Shinn expressed a willingness to supply a home for his wife and to live with her. I felt it my duty to suspend the further hearing of the case and

6

to give the parties an opportunity to become reconciled and to provide a home for their mutual comfort and happiness.   Mr. Shinn undertook to do so.   He immediately rented a house with six rooms and informed his wife of the fact.   She went to examine it and found in the first room a single strip of carpet, in the second room a strip of carpet, a small table, cooking-stove and three or four chairs, two of them having wooden bottoms, a looking-glass, and some meat and other eatables.   The third room on the first floor was a mere shanty.   In the first room on the second floor was a bed, bedstead with very plain bedding upon it, and a strip of carpet on the floor.   In one of the other two rooms there was a lounge.

It is not for the court to say how fully or thoroughly a house must be furnished to make a home such as the law may be fairly presumed to contemplate, but it does seem to me that this exhibition was a very weak pretence at compliance with his duty as a husband and a father.   There certainly is not a branch of the law which attempts to treat of or regulate the family or domestic relations which does not pay a fair if not a rigid regard to the situation, circumstances or condition of the parties whose rights are the subject of judicial inquiry.   Certainly, a building called a house does not make all the conditions necessary to complete the ordinary comforts of a home, but when it is considered, in this particular case, that Mr. Shinn was the owner of a dwelling-house in the city of Bordentown, large enough for his father, mother, a sister, nephew and niece, and himself and his wife, and that, besides this, was in receipt of $60 per month, it is more than plain that this preparation which he called a home, and a tender thereof, as such, to his wife, was shallow mockery and strongly in accordance with his own declaration to the grandfather of his wife and to her sister, when he declared he would not live with his wife again.   It seems that he not only did not take any of the furniture from the room which he had furnished in his own home, to the house which he had rented and offered to his wife as a home, but that, at or about the time when he rented this house, if not before, he actually sold the bed upon which he and his wife had slept during these eleven months

of their stay in his father's family. He says that this bed he could not get into the bed-room of the house which he had rented.

But, to show his mind further, on the first visit of his wife to the house which he had rented, her mother or a friend, Mrs. Lucas, was with her, and one or the other of them when she visited the house the second time. One or both of these ladies he forbid entering the house, but I believe they both went in. He said to his wife that he did not want her mother or any of her relations to visit her, nor did he intend to allow any of his own friends to visit her.

As at first intimated, all these facts tend strongly to show that Mrs. Shinn had been cruelly treated and that she was justified in separating herself from him when she did. His conduct subsequent to the separation certainly would not have been such as it was had nothing transpired upon his part, before she left, to induce her to leave. The correspondence shows that all Mrs. Shinn desired was a home in which she could be mistress. This, every wife is entitled to, and it is the duty of the husband to furnish one corresponding to his circumstances and condition in life. If it be admitted that Mrs. Shinn may not have been fully justified in leaving the place where she was boarding, on the ground of cruelty, it is very clear that she almost immediately afterwards manifested not only a willingness, but a strong desire, to live with her husband as his wife, if he would provide a home for that purpose. It is equally clear to my mind that Mr. Shinn was convinced of this, and therefore insisted upon the condition that she must either come back to him and live with him as a boarder, in the home of another, or in such a house so provided with the comforts of living as above indicated, but which, in my judgment, cannot be regarded as a home corresponding with Mr. Shinn's circumstances and condition in life.

I will advise a decree directing the payment of alimony.